UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| )<br>RAUL HURTADO, Individually and on Behalf )<br>of All Others Similarly Situated, )<br>211 S. Park Avenue )<br>Montebello, California 90640 )<br> )<br> )<br>Plaintiff, )<br> )<br> )<br>vs. )<br>GRAMERCY PROPERTY TRUST )<br>90 Park Avenue )<br>32nd Floor )<br>New York, New York 10016 )<br><u>Registered Agent:</u> )<br>National Registered Agents, Inc. )<br>351 West Camden Street )<br>Baltimore, MD 21201 )<br> )<br>and )<br> )<br>ALLAN J. BAUM )<br>90 Park Avenue )<br>32nd Floor )<br>New York, New York 10016 )<br> )<br>and )<br> )<br>Z. JAMIE BEHAR )<br>90 Park Avenue )<br>32nd Floor )<br>New York, New York 10016 )<br> )<br>and )<br> )<br>CHARLES E. BLACK )<br>90 Park Avenue )<br>32nd Floor )<br>New York, New York 10016 )<br> )<br>and )<br> )<br> ) | Civil Action No.: _____<br><br><br>**COMPLAINT FOR VIOLATIONS OF<br>THE SECURITIES EXCHANGE ACT OF<br>1934 AND U.S. SECURITIES AND<br>EXCHANGE COMMISSION RULE 14a-9**<br><br><br><u>CLASS ACTION</u><br><br><br><u>DEMAND FOR JURY TRIAL</u> | |

GORDON F. DUGAN                          )
90 Park Avenue                           )
32nd Floor                               )
New York, New York 10016                 )
                                         )
and                                      )
                                         )
THOMAS D. ECKERT                         )
90 Park Avenue                           )
32nd Floor                               )
New York, New York 10016                 )
                                         )
and                                      )
                                         )
JAMES L. FRANCIS                         )
90 Park Avenue                           )
32nd Floor                               )
New York, New York 10016                 )
                                         )
and                                      )
                                         )
GREGORY F. HUGHES                        )
90 Park Avenue                           )
32nd Floor                               )
New York, New York 10016                 )
                                         )
and                                      )
                                         )
JEFFREY E. KELTER                        )
90 Park Avenue                           )
32nd Floor                               )
New York, New York 10016                 )
                                         )
and                                      )
                                         )
LOUIS P. SALVATORE                       )
90 Park Avenue                           )
32nd Floor                               )
New York, New York 10016                 )
                                         )
and                                      )
                                         )
                                         )
                                         )
                                         )



MORGAN STANLEY & CO. LLC )
1585 Broadway Avenue )
New York, New York 10036 )
  Registered Agent: )
  The Corporation Trust, Inc. )
  2405 York Road )
  Suite 201 )
  Lutherville-Timonium, Maryland 21093- )
                2264 )
           )
          Defendants. )
          )

      Plaintiff Raul Hurtado ("plaintiff"), by the undersigned attorneys, individually and on behalf of all others similarly situated, respectfully brings this class action for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants and alleges the following:

## SUMMARY OF THE ACTION

      1.     This is a stockholder class action brought on behalf of the holders of Gramercy Property Trust ("Gramercy" or the "Company") common stock against Gramercy, its Board of Trustees (the "Board"), and Morgan Stanley & Co. LLC ("Morgan Stanley").  This matter arises out of defendants' dissemination of, and permission of their names in, a materially misleading proxy statement in connection with the proposed sale of the Company to an affiliate of The Blackstone Group L.P. ("Blackstone") (the "Acquisition" or "Merger").

      2.     Gramercy is a leading global real estate investment trust ("REIT").  In the last two years, Gramercy has been focused on achieving its goal of transforming itself into an industrial REIT.  An industrial REIT is recognized in the public markets as a far better performer than a diversified REIT, which was Gramercy's previous classification.  During a short period, Gramercy

engaged in a significant overhaul of its portfolio, selling off over $1.8 billion in office properties and acquiring over $2.7 billion in quality industrial properties.  By 2018, Gramercy largely achieved its goal, with over 85% of its portfolio comprised of "well located modern industrial space in major markets across the country."

3.     Gramercy's stock price, however, was still lagging behind and did not reflect the value of Gramercy's portfolio overhaul, and Blackstone quickly took the opportunity to capitalize.

4.     On April 3, 2018, Blackstone approached Morgan Stanley, Gramercy's financial advisor.  Morgan Stanley, a financial advisor who historically had a more lucrative financial relationship with Blackstone than Gramercy, advised Blackstone to submit an offer for the Company before the next Board meeting.

5.     On April 26, 2018, Blackstone sent an offer of $27.00 per share, which it raised to $27.50 per share two days later.  Blackstone also agreed to provide Gramercy's management the opportunity to roll over its equity interest in the Company into the combined company, thus aligning Gramercy officers' (including defendant Gordon F. DuGan) interests with Blackstone's interests in a cheap acquisition for a higher upside later.

6.     On May 1, 2018, the Company disclosed that it finally had been reclassified as an industrial REIT in the S&P and MSCI indices.

7.     On May 6, 2018, the Board met to evaluate Blackstone's $27.50 offer.  Morgan Stanley provided its valuation of the Company, which appeared to support the financial fairness of the $27.50 offer.

8.     Morgan Stanley's valuation was objectively flawed however.  It critically evaluated the Company like a diversified REIT instead of an industrial REIT, driving down the valuation of the Company.  Had Morgan Stanley treated the Company as an industrial REIT, Morgan Stanley

would have derived valuations of the Company significantly higher than the $27.50 offer, to valuations in the mid-$30s to $40s.

9.      Relying on Morgan Stanley's flawed valuation, the Board approved the Merger.

10.     On June 27, 2018, and supplemented on July 13, 2018, Gramercy and the Individual Defendants filed the Definitive Proxy Statement ("Proxy").   The Proxy contained the recommendation of each Individual Defendants (defined below) to Gramercy stockholders to vote in favor of the Merger.  The Proxy contained several statements representing the Board's opinion that the Merger is the shareholders' best interests and the Merger consideration was "fair," and provided Morgan Stanley's fairness analyses and fairness opinion to induce shareholder approval of the Merger.

11.     A reasonable shareholder, in the specific context of a cash-out merger transaction like the one at bar, would have understood these statements to convey facts about how the Board and Morgan Stanley made the determinations of fairness.  A reasonable shareholder would have assumed that these statements were not merely personal opinions, but made pursuant to a careful evaluation by the Board and a valid valuation by Morgan Stanley, which applied reasonable assumptions to valid data.

12.     The Proxy failed to disclose facts to disabuse stockholders of these incorrect assumptions.  The Proxy did not disclose that Morgan Stanley's valuation was objectively flawed. The Proxy also omitted facts demonstrating that the Board either did not obtain a valid valuation, or did, and did not disclose this material information which directly contradicted the financial fairness of the Merger.

13.     By omitting the information at issue, defendants induced the Company's stockholders to accept Morgan Stanley's fairness opinion, defer to the Board's recommendation of the Merger, and agree to give up their shares for the inadequate Merger consideration.

14.     By the actions alleged herein, defendants violated §§14(a) and 20(a) of the 1934 Act.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the claims asserted herein pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, for the violations of §§14(a) and 20(a) of the 1934 Act, 15 U.S.C. §§78n(a) and 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

16.     This Court has jurisdiction over each defendant because each defendant is either a corporation that is incorporated in, conducts business in and/or maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391, Gramercy is organized under the laws of this District, defendants either reside in this District or have extensive connections with this District, a substantial portion of the misconduct at issue occurred or were directed at this District and under the laws of this District, and relevant documents and evidence are in this District.

## PARTIES

18.     Plaintiff Raul Hurtado is and was, at relevant times hereto, a shareholder of Gramercy.

19.     Defendant Gramercy Property Trust ("Gramercy") is a Maryland corporation headquartered in New York, New York.

20.     Defendant Allan J. Baum ("Baum") was a Board trustee since December 2015.

21.     Defendant Z. Jamie Behar ("Behar") was a Board trustee since December 2015.

22.     Defendant Charles E. Black ("Black") was a Board trustee since June 2004.  He was also the Chairman of the Board since June 2012.

23.     Defendant Gordon F. DuGan ("DuGan") was Gramercy's Chief Executive Officer ("CEO") and a Board trustee since December 2015.

24.     Defendant Thomas D. Eckert ("Eckert") was a Board trustee since December 2015.

25.     Defendant James L. Francis ("Francis") was a Board trustee since September 2013.

26.     Defendant Gregory F. Hughes ("Hughes") was a Board trustee since December 2015.

27.     Defendant Jeffrey E. Kelter ("Kelter") was a Board trustee since December 2015. Kelter has significant experience specifically with industrial REITs, including his experience as a Founding Partner and CEO of KTR Capital Partners, a private industrial REIT.  In January 2015, the Company acquired three properties from affiliates of KTR Capital Partners during the time Kelter served as CEO and Chairman of the Board.  Kelter also has experience as President, CEO and a trustee of Keystone Property Trust, an industrial REIT, having founded that company's predecessor in 1982.

28.     Defendant Louis P. Salvatore ("Salvatore") was a Board trustee since July 2012.

29.     The defendants named above in ¶¶20-28 are sometimes collectively referred to herein as the "Individual Defendants."

30.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that offers financial advisory and security brokerage services.  The firm was founded in 1969 and is based in New York, New York.

## SUBSTANTIVE ALLEGATIONS

**Gramercy Embarks on Its Repositioning**
**Plan to Be Classified as an Industrial REIT**

31.     Gramercy Capital Corp. was formed as a Maryland REIT in March 2004.

32.     In 2013, the Gramercy Capital Corp. changed its name to Gramercy Property Trust Inc.  Gramercy Property Trust Inc. was a commercial REIT that owned and managed industrial and office properties net-leased on a long-term basis to high-quality tenants in major markets throughout the United States and Europe.  Gramercy Property Trust Inc.'s tenants included Bank of America, Raytheon, Amazon.com, JPMorgan Chase Bank N.A., Nestlé Waters and Philips Electronics.

33.     In December 2015, Gramercy Property Trust Inc. merged with Chambers Street Properties ("Chambers").  Following this merger, Gramercy Property Trust Inc. changed its name to "Gramercy Property Trust" and began trading on the New York Stock Exchange ("NYSE") as "GPT."

34.     Following the merger with Chambers, the Company began to reposition its portfolio to focus primarily on industrial properties.  In the Company's Annual Report on Form 10-K for the year ended December 31, 2015, filed February 29, 2016, the Company stated:

> [W]e plan to reduce overall exposure to office properties through the disposition of select single and multi-tenant office assets. We expect to reinvest those proceeds into target industrial and to a lesser extent, specialty assets. Our current goal is to reduce office exposure to less than 25% as measured by portfolio annual base rent.

35.     By December 31, 2016, the Company completed the majority of that plan.   The Company disposed over $1.5 billion in office assets, and reinvested the proceeds from the dispositions into $1.6 billion of industrial properties.

36.     In the Company's Annual Report on Form 10-K for the year ended December 31, 2016, filed March 1, 2017, the Company stated:

> This has resulted in a significant reduction in our suburban office exposure, a significant reduction in our unconsolidated equity investments and has repositioned our portfolio back to owning primarily institutional quality income oriented industrial properties throughout the United States. As of December 31, 2016, our portfolio is 68.0% industrial (as weighted by ABR as of December 31, 2016).

37.     The Company further disclosed that:

- it "[r]epositioned our portfolio around industrial properties through acquisition of 73 industrial properties and disposition of 22 office properties"; and

- as of December 31, 2016, its "wholly-owned portfolio had 98.5% occupancy."

38.     The Company continued its repositioning plan through 2017.

39.     In a June 2017 presentation, the Company informed its investors of its repositioning progress:



40.     In the Company's Annual Report on Form 10-K for the year ended December 31, 2017, filed March 1, 2018, the Company disclosed that it "acquired 79 properties aggregating approximately 19.6 million square feet for approximately $1.5 billion and also acquired seven land parcels for approximately $10.2 million, on which we have committed to construct industrial facilities for an estimated $95.5 million." The Company also disclosed that it "sold 34 properties as well as two offices that were part of another asset aggregating 3.2 million square feet for gross proceeds of $412.6 million."

41.     As of December 31, 2017, the Company's portfolio was of 78.0% industrial, with a 96.5% occupancy.

42.     The Company continued its repositioning plan through the spring of 2018.

43. In the first quarter of 2018, the Company acquired a core industrial property for $10.6 million and disposed of five assets and a warehouse for aggregate gross proceeds of $111.0 million.

44. In an April 2018 presentation, the Company informed its investors of its repositioning progress:



**The Individual Defendants Are Informed of the Company's
Plan and Success in Repositioning Itself as an Industrial REIT**

45. Each Individual Defendant was well aware of the Company's efforts and success in repositioning itself as an industrial REIT. Each Individual Defendant was on the Board during this period, and the Company's efforts in this regard implicated a key transformation to the Company's core business.

46.     Moreover, the Board on numerous occasions discussed with management and the Company's financial advisor both the industrial real estate business environment generally, and the Company's valuation and performance specifically as an industrial REIT, including in comparison to other industrial REITs.

47.     For example, during an in-person April 26, 2017 Board meeting, the Board "reviewed the Company's business plan and performance metrics comparing the Company to other REITs operating in the industrial and net lease sectors."

48.     During an in-person July 31, 2017 Board meeting, the Board engaged in a "detailed review of the Company's business plan and outlook" which included assessing the "market for acquiring industrial and other real estate properties and the Company's market valuation relative to peer companies."

49.     During an in-person October 25, 2017 Board meeting, the Board authorized a preliminary discussion with an industrial REIT, identified as Company A in the Proxy,

> to explore Company A's interest in considering a strategic transaction involving the Company in light of the board's view that Company A could be a logical transaction counterparty because it was believed to have interest in a transaction with a REIT operating in the industrial sector and would be capable of engaging in a transaction of a significant size.

50.     During an earnings call on November 1, 2017, defendant DuGan stated:

> We sold out of – when we're going to have for NAREIT, the slide that DUKE uses to rank its portfolio on a number of conventional industrial metrics and using the DUKE, slide among public industrial REITs, we have the second largest average building size at 275,000 square feet.  We have the second youngest building age at 13 years and our average clear height of 31 feet is tied with DUKE for the best among our public peers. So again, we have a modern big building, high-quality portfolio that has been a very purposeful evolution for the company.

51.     During an in-person January 24, 2018 Board meeting, "Morgan Stanley reviewed with the board the Company's recent financial performance and recent market developments

affecting the Company, including the competitive environment for acquiring industrial real estate assets and the market valuations of the Company and peer companies."

**The Company Is Undervalued and Mispriced in the Public Market**

52.     In the spring of 2018 time period, the Company was undervalued and mispriced in the market.

53.     The Company's financials were still in transition and did not yet fully reflect the value of the Company's industrial portfolio.

54.     By way of example, during the Company's second quarter 2017 earnings call (on August 2, 2017), which defendant DuGan participated in, the Company's President Benjamin P. Harris explained:

> One thing to note on our same-store sales metric, Gordon [DuGan] mentioned this earlier, because same-store sales is the year-over-year comparison, it's currently capturing a little over half of our overall industrial portfolio because we have been rapidly growing. In future quarters, this metric will begin to capture a greater percentage of the industrial portfolio as we finished repositioning out of office and should give a more fulsome overall picture of the portfolio performance. As an example, we acquired a $520 million industrial portfolio at the end of last year, where we leased or renewed over a million square feet at an average cash leasing spread of 22% and boosted our effective yield on cost of almost 25 basis points. This would translate into a 4% same-store sales growth on this portfolio. However, this entire portfolio is currently excluded from our same-store sales metrics and won't be included until Q1 2018.

55.     Moreover, the Company was still being classified as a diversified REIT in the S&P and MSCI indices, and the performance of diversified REITs was inferior to industrial REITS.

56.     For example, the chart below shows that industrial REITs have outperformed diversified REITs in compound average total returns for the last three years:[1]

---

[1]     This information is from Nareit, the leading public resource on the REIT industry.  The full chart is available at https://www.reit.com/news/blog/market-commentary/reit-total-returns-property-type-value-exposure-all-sectors-real-estate.

|  | April 2016 compound average total return | April 2017 compound average total return | April 2018 compound average total return |
|---|---|---|---|
| Industrial REITS | 17.33% | 27.10% | 16.55% |
| Diversified REITS | -0.19% | 8.15% | -13.00% |

57.     In the spring of 2018, industrial was the hot REIT sector in both market performance and fundamental growth while other REIT sectors were not likewise rewarded by the market.

58.     The public market's temporary but significant mispricing of Gramercy's shares opened the door for Blackstone.

**Blackstone Approaches the Company's CEO and Morgan Stanley, and Two Months Later the Board Agrees to Acquisition**

59.     On March 1, 2018, defendant DuGan met with Tyler Henritze ("Henritze"), the Senior Managing Director in Blackstone's real estate group.  Henritze told DuGan that Blackstone was interested in acquiring the Company.  Henritze told DuGan that Blackstone was specifically interested in the Company's industrial portfolio.

60.     On April 3, 2018, Henritze contacted Morgan Stanley and told Morgan Stanley that Blackstone was interested in acquiring the Company.   Henritze told Morgan Stanley that Blackstone was interested because its current strategic plan was to focus on acquiring industrial real estate assets.

61.     On April 4, 2018 and April 11, 2018, Morgan Stanley told Henritze and Jonathan Gray, President of Blackstone, that Blackstone should make an offer before the next Board meeting on April 26, 2018.   The Proxy does not indicate that Morgan Stanley did so with the prior knowledge or authority of the full Board.

62.     Morgan Stanley has a significant relationship with Blackstone.  In the last two years or so, Morgan Stanley received approximately $10 million to $25 million in fees from Gramercy. In comparison, during the same period, Morgan Stanley has received approximately $100 million to $125 million in fees from Blackstone.

63.     On April 20, 2018, Blackstone representatives met with (unspecified) Gramercy representatives, Morgan Stanley and Eastdil Secured, L.L.C. ("Eastdil").  Eastdil had been retained by the Company under undisclosed terms to provide "real estate consulting services."  The purpose of this meeting was to conduct a review of the Company's industrial assets.

64.     About one week later, on April 26, 2018, Blackstone sent a letter to the Board, proposing an all-cash acquisition of the Company at $27.00 per share.

65.     Two days later on April 28, 2018, the Board met to discuss Blackstone's offer.  The Board had not conducted any market check or competitive sales process thus far (although according to the Proxy, management and Morgan Stanley apparently had general, informal discussions with three REITs in the net lease and/or industrial sectors and one investment firm without Board participation), and in that context, the Board recognized and acknowledged the importance of having a go-shop process after the signing of any merger agreement with Blackstone to solicit a higher price per common share from alternative bidders.

66.     Later that day, when Morgan Stanley conveyed the Board's position to Henritze, Henritze told Morgan Stanley that Blackstone was not willing to agree to a post-signing go-shop. Blackstone then submitted a letter proposing an all-cash acquisition of the Company at $27.50 per share, which additionally assumed that the Company would not pay any dividends on its common shares other than its next regularly scheduled dividend.

67.     Thereafter, still on the same day, the Board held a second meeting.  Not 24 hours had passed, and the Board agreed not to pursue a post-signing go-shop.  Instead, the Board agreed to pursue merger-related benefits for the Company's officers, such as rollover equity in the post-merger company.

68.     Later that same day, Wachtell, Lipton, Rosen & Katz ("Wachtell") sent a draft merger agreement to Blackstone's counsel.  The merger agreement contemplated that the Company's officers' equity interests, vested or unvested, would convert into equity interests of the new combined company.

69.     On May 1, 2018, the Company held its first quarter 2018 earnings call.  During the call, defendant DuGan stated that the Company had finally been recognized and reclassified as an industrial REIT in the S&P and MSCI indices.  He stated:

> Today, Gramercy is roughly 85% industrial by value.  We're the 8th largest owner in the United States, public or private, with a high-quality portfolio in major markets of, roughly, 77 million square feet.  As part of that acknowledgment, or the acknowledgment of the shift in the business, as of April 30, as of yesterday, we changed our GIC classification at S&P from diversified to industrial.  And similarly, for MSCI, our classification has changed.  It's actually – it's as of April 30, but when our associate looked on the Bloomberg, we found we were still diversified yesterday, but as of this morning, we're industrial.  So our MSCI classification has also changed to industrial.  So that kicks in today.

70.     On May 6, 2018, the Board met to discuss Blackstone's $27.50 per share offer.  During this meeting, Morgan Stanley presented its financial analyses (summarized on pages 54-62 of the Proxy), including its *Comparable Public Companies Analysis*.  Morgan Stanley's financial analyses were objectively flawed, as discussed in detail below.  Based on the flawed analyses, Morgan Stanley provided its fairness opinion, and relying on the fairness opinion, the Board decided to approve the merger agreement.

71.     On May 6, 2018 – two months after Blackstone's first meeting with Gramercy's CEO, and only *ten days* after Blackstone's first offer for the Company – the Board unanimously approved the merger agreement.

72.     On May 7, 2018, the Company issued a press release announcing the Merger.

**The Merger Consideration Was Inadequate, and the
Merger Offered Material Benefits for Gramercy Officers**

73.     The Merger was timed to take advantage of a temporary low point in the Company's stock price.  The Company's stock consistently traded near or higher than $27.50 as recently as December 2017, and in the $30s in September and October 2017.

74.     Moreover, as discussed above, the Company's stock was undervalued at this time, as the Company's financials did not reflect the value of Gramercy's industrial assets, and because the Company had not been classified as an industrial REIT in the relevant indices.

75.     The Merger, in fact, reflected a price of an acquisition of a diversified REIT, not an industrial REIT.  The Merger implied a valuation multiple for Gramercy of approximately 13x FFO.  That multiple is consistent with a diversified REIT.  However, industrial REITs traded during this time at an average of 18x FFO:

| Industrial | | | | | | | |
|---|---|---|---|---|---|---|---|
| Americold Realty Trust | COLD | 18.00 | 18.88 | 17.53 | 1.05 | 1.16 | 17.21 |
| DCT Industrial Trust | DCT | 55.35 | 61.42 | 47.17 | 2.58 | 2.73 | 21.46 |
| Duke Realty Corp | DRE | 24.77 | 30.14 | 24.52 | 1.27 | 1.36 | 19.48 |
| Eastgroup Properties | EGP | 81.03 | 94.97 | 72.31 | 4.50 | 4.70 | 17.99 |
| First Industrial Realty Trust | FR | 28.03 | 32.82 | 26.10 | 1.62 | 1.72 | 17.32 |
| Industrial Logistics Properties Trust | ILPT | 20.08 | 23.41 | 20.08 | 1.66 | 1.76 | 12.10 |
| Liberty Property Trust | LPT | 39.26 | 45.29 | 37.96 | 2.58 | 2.69 | 15.21 |
| Monmouth REIT Cl A | MNR | 14.12 | 18.19 | 13.89 | 0.91 | 0.96 | 15.58 |
| Plymouth Industrial REIT | PLYM | 16.77 | 19.00 | 16.25 | 1.60 | - | 10.48 |
| Prologis | PLD | 60.68 | 67.40 | 50.64 | 2.90 | 3.12 | 20.89 |
| PS Business Parks | PSB | 110.86 | 137.43 | 108.30 | 6.38 | 6.54 | 17.38 |
| Rexford Industrial Realty | REXR | 27.00 | 31.52 | 22.16 | 1.07 | 1.15 | 25.24 |
| STAG Industrial | STAG | 22.77 | 28.82 | 22.58 | 1.82 | 1.92 | 12.50 |
| Terreno Realty | TRNO | 33.31 | 38.32 | 27.54 | 1.09 | 1.21 | 30.56 |
| **AVERAGE** | | 39.43 | 46.26 | 36.22 | 2.22 | 2.39 | 18.10 |

76.     As one analyst observed:

        Gramercy owns quality industrial assets that just never received the valuation they deserved because of the ongoing portfolio repositioning.  This gave

an opportunity for a savvy private equity investor (Blackstone) to take the company private, along with all its valuable industrial assets.

As a Gramercy shareholder, I am rather disappointed because the short-term gain appears to be minimal compared to what I could have expected from this investment in the long run.

77.     A low sale price, on the other hand, was very favorable for the Company's officers (and in this way aligned the officers with Blackstone).  Pursuant to the Merger, officers received the opportunity to roll over their equity interest in Gramercy into the post-merger company.  The lower the sale price, the cheaper the roll, and the higher the upside when the Company generated the growth expected by management.

78.     Moreover, Blackstone agreed to certain protections for the officers' new equity interests in the post-merger company, including liquidation preferences of $27.50 plus for each preferred stock.

79.     With respect to Morgan Stanley, Morgan Stanley earned approximately $34 million for its services and fairness opinion, all of which was contingent on the closing of the Merger.

**The Misleading Proxy**

80.     On June 27, 2018, and supplemented on July 13, 2018, Gramercy and the Individual Defendants filed the Proxy.

81.     The Proxy contained the recommendation of each of the Individual Defendants to Gramercy stockholders to vote in favor of the Merger.

82.     The Proxy contained several statements representing the Board's opinion that the Merger is the shareholders' best interests and the Merger consideration was "fair":

- The Board declared that the merger was "advisable and in the best interests of the Company and our shareholders" (Proxy at 5, 44, 47).

83.     The Proxy contained several statements representing the representation concerning fairness was supported by a valid valuation:

- Morgan Stanley rendered its opinion that "the merger consideration to be received by the holders of Company common shares pursuant to the merger agreement was fair from a financial point of view to such holders" (Proxy at 43-44); and

- the Board considered Morgan Stanley's financial analysis and opinion that "the merger consideration to be received by holders of Company common shares pursuant to the merger agreement was fair from a financial point of view to such holders," as a "material factor[] . . . supporting its decision to approve the merger agreement" (Proxy at 44-46).

84.     The Proxy summarized Morgan Stanley's analyses on pages 54-62.  The Proxy attached the full written opinion, signed by Executive Director Mike Connor of Morgan Stanley, as Exhibit B.

85.     The statements above in ¶¶81-84 were made in a cash-out merger context.  A reasonable shareholder, in this specific context, would have understood these statements to convey facts about how the Board and Morgan Stanley made the determinations of fairness.  A reasonable shareholder would have assumed that these statements were not merely personal opinions, but made pursuant to a careful evaluation by the Board and a valid valuation by Morgan Stanley, which applied reasonable assumptions to valid data.

86.     Thus, these statements misled stockholders because the real facts were otherwise.

87.     A key part of Morgan Stanley's financial analyses was its *Comparable Public Companies Analysis*.

88.     In that analysis, Morgan Stanley selected five companies it designated as comparable to the Company: (i) Lexington Realty Trust; (ii) Monmouth Real Estate Investment Corporation; (iii) STAG Industrial, Inc.; (iv) W.P. Carey Inc.; and (v) VEREIT, Inc. (Proxy at 56).

89.     Based on the five comparable companies, Morgan Stanley selected and utilized a range of 11x to 13x multiples to the Company's financial metrics to derive a valuation range in the low to mid $20s for the Company's stock.

90.     The Proxy did not disclose facts demonstrating that Morgan Stanley's analyses and conclusions of value were objectively flawed.  The fundamental requirement of a *Comparable Public Companies Analysis* is that the banker selects and analyzes similar companies.

91.     The companies selected and analyzed by Morgan Stanley, however, were not comparable to Gramercy.  Only two comparable companies were industrial REITs – a fact that is not disclosed in the Proxy.

92.     Looking outside the Proxy at information which defendants specifically instructed stockholders to ignore[2] (and which would have been difficult for stockholders to spot without a financial analyst), this information demonstrates that industrial REITs traded at 18x-20x FFO.  *See* ¶75 above.

93.     Those multiples imply a valuation of the Company's stock in the mid-$30s to $40s.

94.     Either Morgan Stanley performed a valuation based on industrial REITs, and the Proxy did not disclose the valuation, or Morgan Stanley did **not** perform a valuation based on industrial REITs, and the Proxy did not disclose that: (i) the Board made the statements in ¶¶81-

---

[2]     The Proxy states on page 112:

> YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE IN THIS PROXY STATEMENT TO VOTE YOUR COMMON SHARES AT THE SPECIAL MEETING.  WE HAVE NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH INFORMATION THAT IS DIFFERENT FROM, OR IN ADDITION TO, WHAT IS CONTAINED IN THIS PROXY STATEMENT OR IN ANY OF THE MATERIALS THAT ARE INCORPORATED BY REFERENCE IN THIS PROXY STATEMENT.

84 without actually evaluating fundamental valuations; and (ii) the statements in ¶¶81-84 were not supported by non-public data concerning the Company.

95.     The omission of these facts concerning the objective flaws in Morgan Stanley's analyses and defendants' knowledge of the same, and/or defendants' inquiry (or lack of inquiry) before issuing statements representing fairness, rendered the statements in ¶¶81-84 materially misleading.

96.     The omissions at issue were directly germane to the choice in front of Gramercy stockholders – cash out at $27.50 per share, or continue with the Company to secure the expected value of the Company as a reclassified industrial REIT.

97.     There is no information more material to shareholders in a cash-out merger than the information underlying or supporting the purported "fair value" of their shares, like a banker's valuation.    Defendants themselves admitted that a "material" factor underlying their recommendation of the Merger was the valuation performed by Morgan Stanley.

98.     The omitted information was necessary for stockholders to discern that Morgan Stanley's valuation was objectively flawed, and the Merger consideration was unfair.

99.     Had the omitted information been disclosed, the Company's stockholders would have been able to appreciate the flaws in Morgan Stanley's analysis, and would have been inclined to reject Morgan Stanley's fairness opinion and the Board's recommendation of the Merger.

100.     By omitting the information at issue, defendants induced the Company's stockholders to accept Morgan Stanley's fairness opinion, defer to the Board's recommendation of the Merger, and give up their shares for the inadequate Merger consideration.

101.     On August 9, 2018, defendants held a special meeting of shareholders.    The misleading Proxy was an essential link in obtaining stockholder approval of the Merger.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of holders of Gramercy common stock who were harmed by defendants' actions described below (the "Class").   Excluded from the Class are defendants herein, the Company's executive officers, and their relatives, affiliates and associates.

103.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

104.    The Class is so numerous that joinder of all members is impracticable.   According to the Proxy, as of the record date June 26, 2018, there were approximately 160,792,820 shares of Gramercy common stock outstanding.

105.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

(a)    whether defendants disseminated a materially misleading proxy statement in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder;

(b)    whether defendants permitted the use of their names in a materially misleading proxy statement in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated;

(c)    whether defendants had the ability to and did control a person or persons who have violated §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, in violation of §20(a) of the 1934 Act; and

(d)      whether misstatements in and/or omissions from the Proxy caused injury to plaintiff and the Class.

106.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

107.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

108.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

109.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

110.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### For Violations of §14(a) of the 1934 Act and Rule 14a-9
### Promulgated Thereunder Against Gramercy, the Individual Defendants
### and Morgan Stanley

111.    Plaintiff repeats and realleges each allegation set forth herein.

112.    The Individual Defendants and Gramercy prepared, reviewed and/or disseminated the Proxy.

113.    The Proxy contained the unanimous recommendation of each of the Individual Defendants, solicited votes on behalf of each of the Individual Defendants, and purported to

describe the various issues and information each of the Individual Defendants considered and relied on in approving the Merger. The Individual Defendants reviewed, had access to, participated in drafting and editing, and approved the statements in the Proxy.

114. Morgan Stanley permitted the use of its name in the Proxy, and there was a substantial connection between the name and the Proxy solicitation.

115. The Proxy omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

116. The omissions and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on an acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in a proxy and in other information reasonably available to shareholders. The misleading Proxy had the intended effect: causing a materially misinformed vote of the Gramercy shareholders.

117. The Individual Defendants, Gramercy and Morgan Stanley were at least negligent in connection with the materially false and misleading statements in the Proxy.

118. Because of the false and misleading statements in the Proxy, plaintiff and the members of the Class were harmed.

119. As a direct result of defendants' negligent preparation, review, use of their names in, and dissemination of the false and/or misleading Proxy, plaintiff and the Class were induced to vote their shares and accept the inadequate consideration in connection with the Acquisition. The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition deprived plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Gramercy shares.

120.     Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy, defendants obtained shareholder approval of and will consummate the Acquisition, harming plaintiff and the Class and causing them actual economic losses (*i.e.*, the difference between the price Gramercy shareholders receive in the Merger versus Gramercy's true value at the time of the Acquisition) in an amount to be determined at trial.

121.     By reason of the foregoing, Gramercy, the Individual Defendants and Morgan Stanley violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

122.     Plaintiff repeats and realleges each allegation set forth herein.

123.     The Individual Defendants acted as controlling persons of Gramercy within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Gramercy and participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

124.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

125.     In particular, each of the Individual Defendants had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and

exercised the same.  The Proxy at issue contained the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.  They were thus directly involved in the making of this document.

126.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Acquisition.  The Proxy purported to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants.

127.     By virtue of the foregoing, the Individual Defendants violated §20(a) of the 1934 Act.

128.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Gramercy shareholders have been harmed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment, in plaintiff's favor and in favor of the Class and against defendants, as follows:

A.     Determining that this action is a proper class action, certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Declaring that defendants solicited proxies by a materially false and misleading Proxy, and/or permitted the use of their names in a materially false and misleading Proxy, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.      Declaring that defendants had the ability to exercise control over and did control a

person or persons who have violated Rule 14a-9 and §14(a) of the 1934 Act, in violation of §20(a)

of the 1934 Act;

D.      Awarding damages to plaintiff and the Class;

E.      Awarding plaintiff the costs and disbursements of this action, including reasonable

attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and

proper.

### JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  August 31, 2018


/s/ Dana W. McKee
_____
DANA W. McKEE (04447)
JOSEPH B. ESPO (07490)
BROWN, GOLDSTEIN & LEVY,
    LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Telephone:  410/962-1030
410/385-0869 (fax)
dwm@browngold.com
jbe@browngold.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID T. WISSBROECKER
DANIELLE S. MYERS
EUN JIN LEE
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
dwissbroecker@rgrdlaw.com
elee@rgrdlaw.com

JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)
scotth@johnsonfistel.com

Attorneys for Plaintiff