# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RAUL HURTADO, *et al.*,
    *Plaintiffs*

v.

                Civil Action No. ELH-18-2711

GRAMERCY PROPERTY TRUST, *et al*.,
    *Defendants.*

## MEMORANDUM OPINION

This stockholder class action suit centers on a 220-page proxy statement (the "Proxy") issued by Gramercy Property Trust ("Gramercy" or the "Company"), a real estate investment trust, in connection with the sale of Gramercy to an affiliate of the Blackstone Group L.P. ("Blackstone"). Plaintiff Raul Hurtado, a former shareholder of Gramercy, filed suit individually and on behalf of a putative class of shareholders against Gramercy; Gramercy's financial advisor, Morgan Stanley & Co., LLC ("Morgan Stanley"); and members of Gramercy's Board of Trustees (the "Board Defendants"),[1] alleging that the Proxy was materially misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "Act"), 15 U.S.C. §§ 78a *et seq.*, as well as Securities and Exchange Commission ("SEC") Rule 14a-9. ECF 1 (the "Complaint"). According to plaintiff, the Proxy was misleading because it omitted material information with respect to an analysis summarized in the Proxy that underpinned Morgan Stanley's determination that the merger was financially fair to Gramercy's shareholders (the "Fairness Opinion").

---

[1] The Board Defendants are Allan J. Baum, Z. Jamie Behar, Charles E. Black, Gordon F. DuGan, Thomas D. Eckert, James L. Francis, Gregory F. Hughes, Jeffrey E. Kelter, and Louis P. Salvatore. ECF 1, ¶¶ 20-28.

In particular, the Complaint contains two claims. Count I, lodged against all defendants, alleges a violation of § 14(a) of the Exchange Act and Rule 14a-9. ECF 1, ¶¶ 111-21. Count II, lodged against the Board Defendants, asserts a violation of § 20(a) of the Act. *Id.* ¶¶ 122-28. Plaintiff seeks compensatory damages and attorneys' fees and costs, as well as a declaratory judgment that defendants violated the Exchange Act. *Id.* at 26-27.

Gramercy and the Board Defendants filed a joint motion to dismiss for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 26. It is supported by a memorandum of law. ECF 26-1 (collectively, the "Gramercy Motion"). Five exhibits are appended to the Gramercy Motion. ECF 26-2 to ECF 26-6. Morgan Stanley has also moved to dismiss the Complaint, pursuant to Rule 12(b)(6) (ECF 27), supported by a memorandum. ECF 27-1 (collectively, the "Morgan Stanley Motion"). The Morgan Stanley Motion also includes four exhibits. ECF 27-3 to ECF 27-6. Plaintiff opposes the motions (ECF 37), and defendants filed a joint reply. ECF 38.

No hearing is necessary to resolve the motions. *See* Local Rule 105(6). For the reasons that follow, I shall grant the motions (ECF 26, ECF 27).

## I.  Factual and Procedural Background[2]

### A.  Gramercy's Pre-Acquisition Business

Gramercy is a global real estate investment trust ("REIT"). ECF 1, ¶¶ 2, 31. A REIT "is a company that owns, operates or finances income-producing real estate." *What's a REIT?*, Nariet, https://www.reit.com/what-reit (last visited Dec. 4, 2019). Generally, REITs focus on a particular market sector. For example, "industrial REITs" hold properties such as warehouses and

---

[2] Given the procedural posture of this case, I must assume the truth of all factual allegations in the Complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

distribution centers. *REIT Sectors*, Nareit, https://www.reit.com/what-reit/reit-sectors (last visited Dec. 4, 2019). REITs that hold an assortment of properties are labeled "diversified REITs." *Id.*

In December 2015, Gramercy owned a mix of industrial and office properties in major markets throughout the United States and Europe. ECF 1, ¶ 32. At the time, its portfolio was approximately 48% office, 47% industrial, and 5% specialty retail. *Id.* ¶ 44. But, in early 2016, Gramercy announced its intent to grow its industrial holdings. *Id.* ¶ 34. Over the course of 2016, Gramercy sold over $1.5 billion in office assets and acquired $1.6 billion in industrial properties. *Id.* ¶ 35. Gramercy continued to focus on industrial properties throughout 2017. *Id.* ¶ 38.

Gramercy's Board of Trustees (the "Board") allegedly regarded Gramercy's repositioning as a "key transformation to the Company's core business." *Id.* ¶ 45. During a meeting held on April 26, 2017, the Board "'reviewed the Company's business plan and performance metrics comparing the Company to other REITs operating in the industrial and net lease sectors.'" *Id.* ¶ 47. On October 25, 2017, the Board authorized a preliminary discussion with an industrial REIT to explore the possibility of a strategic transaction. *Id.* ¶ 49. And, on January 24, 2018, the Board met with Morgan Stanley, which was providing Gramercy with financial advisory services, to review "'the Company's recent financial performance and recent market developments affecting the Company, including the competitive environment for acquiring industrial real estate assets and the market valuations of the Company and peer companies.'" *Id.* ¶ 51. By April 2018, Gramercy's portfolio was approximately 15% office, 81% industrial, and 4% specialty retail. *Id.* ¶ 44.

Due to Gramercy's swift transition, its financials "did not yet fully reflect the value of the Company's industrial portfolio." *Id.* ¶ 53; *see id.* ¶ 54. As a result, the S&P Index and the Morgan Stanley Capital International Index (the "MSCI"), major stock market indices, continued to classify Gramercy as a diversified REIT, as opposed to an industrial REIT. *Id.* ¶ 55. The market's

perception of Gramercy as a diversified REIT was significant because industrial REITs were outperforming diversified REITs. *Id.* ¶¶ 55-57. Thus, plaintiff alleges that Gramercy "was undervalued and mispriced in the market." *Id.* ¶ 52.

## B. The Blackstone Acquisition

On March 1, 2018, the Senior Managing Director of Blackstone's real estate group, Tyler Henritze, told Gramercy's Chief Executive Officer ("CEO"), Gordon DuGan, that Blackstone was interested in acquiring Gramercy. *Id.* ¶ 59; *see* ECF 26-2 at 44 (the "Proxy"). DuGan directed Henritze to contact Morgan Stanley. ECF 26-2 at 44. On April 3, 2018, Henritze spoke with a representative of Morgan Stanley to express Blackstone's interest in purchasing Gramercy because of Gramercy's industrial portfolio. ECF 1, ¶ 60. The next day, and again on April 11, 2018, Morgan Stanley invited Henritze to make an offer before the Board met on April 26, 2018. *Id.* ¶ 61.

Henritze informed Morgan Stanley on April 25, 2018, that Blackstone intended to propose a price of $26.50 per share to acquire Gramercy. ECF 26-2 at 47. However, Morgan Stanley advised Blackstone that the Board would view that price as inadequate. *Id.* On April 26, 2018, Blackstone submitted a bid, proposing an all-cash acquisition of Gramercy at $27.00 per share. ECF 1, ¶ 64; ECF 26-2 at 47.

Later the same day, the Board discussed Blackstone's proposal during its regularly scheduled meeting. ECF 26-2 at 47.[3] Additionally, it reviewed other potential strategic transactions that Morgan Stanley had explored on Gramercy's behalf with other companies. *Id.*

---

[3] According to the Complaint, the negotiations between Gramercy and Blackstone occurred entirely on April 28, 2018. ECF 1, ¶¶ 65-68. However, the Proxy states that the Board reviewed Blackstone's initial $27.00 per share offer on April 26, 2018, and that discussions unfolded over the course of April 26, April 27, and April 28, 2019. ECF 26-2 at 47-50.

Ultimately, the Board directed Morgan Stanley to inform Blackstone that it would not pursue a transaction at $27 per share. *Id.* at 48. Blackstone responded on April 27, 2018, by increasing its proposed price to $27.30 per share, provided that Gramercy would agree not to issue its next scheduled dividend, or $27.00 per share with no restriction on Gramercy's ability to pay regular quarterly dividends prior to the closing of the acquisition. *Id.*

The Board held a telephonic meeting on April 28, 2018, to discuss the offer. *Id.* It decided to continue negotiating with Blackstone, with the goal of obtaining a higher price per common share and with terms that allowed Gramercy to solicit alternative acquisition proposals during the pendency of the merger. *Id.* at 49; *see* ECF 1, ¶ 65. Morgan Stanley relayed the Board's response to Blackstone. ECF 26-2 at 49; ECF 1, ¶ 66. Blackstone responded that it would not agree to Gramercy's proposed terms. ECF 26-2 at 49. However, it increased its offer to $27.50 per share. *Id.* Shortly thereafter, Blackstone submitted a letter confirming its proposal. *Id.* During a second telephonic meeting on April 28, 2019, the Board agreed to move forward with those terms and to provide Blackstone with additional due diligence information. *Id.*

Gramercy "held its first quarter 2018 earnings call" on May 1, 2018. ECF 1, ¶ 69. During the call, DuGan claimed that "the Company had finally been recognized and reclassified as an industrial REIT in the S&P and MSCI indices." *Id.* He stated, *id.*:

> Today, Gramercy is roughly 85% industrial by value. We're the 8th largest owner in the United States, public or private, with a high-quality portfolio in major markets of, roughly, 77 million square feet. As part of that acknowledgment, or the acknowledgment of the shift in the business, as of April 30, as of yesterday, we changed our GIC classification at S&P from diversified to industrial. And similarly, for MSCI, our classification has changed. It's actually – it's as of April 30, but when our associate looked on the Bloomberg, we found we were still diversified yesterday, but as of this morning, we're industrial. So our MSCI classification has also changed to industrial. So that kicks in today.

On May 6, 2018, the Board met with Morgan Stanley and its counsel, Watchell, Lipton, Rosen & Katz ("Watchell"), to review the terms of Blackstone's offer. *Id.* ¶ 70. During the meeting, Morgan Stanley presented its opinion that the merger was financially fair to Gramercy's common shareholders. *Id.*; ECF 26-2 at 50-51. And, Watchell reviewed the draft merger agreement with the Board and discussed the interests that the Board and executive officers had in the merger that differed from shareholders. ECF 26-2 at 51. Based on this information, the Board unanimously approved the merger agreement. ECF 1, ¶ 71; ECF 26-2 at 51. The parties executed the merger agreement and other transaction documents during the evening of May 6, 2018. ECF 26-2 at 51.

Gramercy issued the Proxy to its shareholders on June 27, 2018, to solicit votes on the proposed merger. ECF 1, ¶ 80; *see generally* ECF 26-2. The Proxy was supplemented on July 13, 2018. ECF 1, ¶ 80. And, on August 9, 2018, a majority of shareholders approved Blackstone's acquisition of Gramercy. *See id.* ¶ 101; ECF 26-6 at 2. Approximately 117.5 million out of 119 million shares, or 99% of shares, voted in favor of the deal. ECF 26-6 at 2.

### C. The Proxy Statement

The Proxy contained numerous disclosures. Of relevance here, it contained a nine-page summary of Morgan Stanley's Fairness Opinion. *See id.* 26-2 at 61-69. And, the full text of the Fairness Opinion, dated May 6, 2018, was included as an exhibit to the Proxy. *Id.* at 215-17.

The Proxy disclosed that Gramercy "retained Morgan Stanley to provide [the Company] with financial advisory services in connection with the proposed merger." *Id.* at 61. And, it stated that Morgan Stanley, "based upon and subject to the various assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of [its] review," informed the Board that, in its opinion, "the merger consideration to be received by the holders of

[Gramercy's] common shares pursuant to the merger was fair from a financial point of view[.]"
*Id.* Morgan Stanley's opinion was immediately followed by a warning, in bold, *id.* (emphasis in original):

> **The full text of the written opinion of Morgan Stanley, dated as of May 6, 2018, is attached to this proxy statement as Exhibit B and is hereby incorporated into this proxy statement by reference in its entirety. You should read the opinion in its entirety for a discussion of the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of the review undertaken by Morgan Stanley in rendering its opinion. We encourage you to read the entire opinion and the summary of Morgan Stanley's opinion below carefully and in their entirety. This summary of the opinion of Morgan Stanley set forth in this proxy statement is qualified in its entirety by reference to the full text of the opinion. Morgan Stanley's opinion is directed to our board of trustees, in its capacity as such, addresses only the fairness of the merger consideration to be received by the holders of our common shares pursuant to the merger agreement from a financial point of view to such holders as of the date of the opinion and does not address any other aspects or implications of the mergers. Morgan Stanley's opinion was not intended to, and does not, constitute a recommendation to any holder of our common shares as to how to vote at the special meeting to be held in connection with the mergers or whether to take any other action with respect to the mergers. Morgan Stanley was not requested to opine as to, and its opinion did not in any manner address the relative merits of, the transactions contemplated by the merger agreement as compared to other business or financial strategies that might be available to the Company, nor did it address the underlying business decision of the Company to enter into the merger agreement or proceed with any other transaction contemplated by the merger agreement.**

Further, the Proxy disclosed that Morgan Stanley performed seven financial valuations in connection with the Fairness Opinion: (1) "Research Analyst Price Targets and NAV ['Net Asset Value'] Targets" analysis; (2) "Comparable Public Companies Analysis"; (3) "Net Asset Value Analysis"; (4) "Discounted Cash Flow Analysis"; (5) "Premiums Paid Analysis"; (6) "Private Buyer Analysis"; and (7) "Historical Stock Price" analysis. *See id.* at 63-67.

Plaintiff takes issue only with the Comparable Public Companies Analysis ("CPC Analysis"). ECF 1, ¶¶ 87-94. A CPC Analysis is a valuation technique that estimates the market

value of a company by comparing it to peer companies using publicly available financial information.  *See* SHANNON P. PRATT, THE MARKET APPROACH TO VALUING BUSINESSES 88-89 (2d ed. 2005).

The Proxy disclosed that Morgan Stanley selected five publicly-traded companies that "share similar business characteristics" with Gramercy.  ECF 26-2 at 63.  The comparator companies were: (1) Lexington Realty Trust; (2) Monmouth Real Estate Investment Corporation; (3) STAG Industrial, Inc.; (4) W.P. Carey Inc.; and (5) VEREIT, Inc.  *Id.*  Further, the Proxy disclosed the specific financial variables (*i.e.*, ratios) that Morgan Stanley used to evaluate Gramercy and the comparator companies, and the ranges that it established for each ratio.  *Id.* at 64.  The ratios examined were: (1) share price to estimated funds from operations ("FFO") for the 2018 calendar year as determined from a consensus of Wall Street research analysts ("Street consensus"); (2) share price to Street consensus estimated adjusted funds from operations ("AFFO") for the 2018 calendar year; (3) aggregate value to the Street consensus for earnings before interest, taxes, depreciation, and amortization ("EBITDA") for the 2018 calendar year; (4) share price to Street consensus NAV; and (5) share price to management's NAV.  *Id.*

In addition, the Proxy described the way in which Morgan Stanley calculated Gramercy's "implied per share equity value reference range" for each ratio, *i.e.*, the approximate market value of a Gramercy share based on that particular financial metric.  *Id.*  Those estimates were arranged in the following chart, *id.*:

| | Range | | Implied Per Share Equity Value Range | |
|---|---|---|---|---|
| | Low | High | Low | High |
| Price / 2018E FFO | 11.2x | 13.2x | $ 22.70 | $ 26.74 |
| Price / 2018E AFFO | 11.4x | 13.4x | $ 21.94 | $ 25.79 |
| Aggregate Value / 2018E EBITDA | 14.3x | 15.3x | $ 19.95 | $ 22.61 |
| Premium / Discount to the mean Street consensus estimated NAV | (14)% | (4)% | $ 22.28 | $ 24.88 |
| Premium / Discount to our management's estimated NAV | (14)% | (4)% | $ 22.72 | $ 25.37 |

Finally, the Proxy explained that Morgan Stanley estimated that the market value of a common share of Gramercy stock was between $21.92 and $25.08. *Id.*

The summary of the CPC Analysis concluded with the following warning: "No company utilized in the comparable company analysis is identical to the Company. . . . Morgan Stanley made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, which are beyond the Company's control[.]" *Id.*

The Proxy's summary of the Fairness Opinion contained additional admonishments. For example, it cautioned that "[t]he preparation of a financial opinion is a complex process and is not necessarily susceptible to a partial analysis or summary description." *Id.* at 68. And, it advised that "Morgan Stanley's opinion and presentation to our board was one of many factors taken into consideration by our board of trustees," and therefore it "should not be viewed as determinative of the opinion of our board of trustees with respect to the merger[.]" *Id.*

**D. Plaintiff's Lawsuit**

Plaintiff filed suit against Gramercy, the Board Defendants, and Morgan Stanley on August 31, 2018. ECF 1. According to plaintiff, the merger "was timed to take advantage of a temporary low point in the Company's stock prices." *Id.* ¶ 73. Gramercy was allegedly undervalued because "the Company's financials did not reflect the value of Gramercy's industrial assets, and because the Company had not been classified as an industrial REIT in the relevant indices." *Id.* ¶74. Thus,

plaintiff claims that Blackstone's offer of $27.50 per share "reflected a price of an acquisition of a diversified REIT, not an industrial REIT." *Id.* ¶ 75.

According to plaintiff, neither the Board Defemdants nor Morgan Stanley had an incentive to seek a better deal. *See id.* ¶¶ 77-79. He asserts that a low sale price was "very favorable" for the Company's officers, because they "received the opportunity to roll over their equity interest in Gramercy into the post-merger company" and "[t]he lower the sale price, the cheaper the roll, and the higher the upside when the Company generated the growth expected by management." *Id.* ¶ 77. As for Morgan Stanley, it allegedly earned $34 million for its services related to the merger, including the Fairness Opinion, which was contingent on the closing of the merger. *Id.* ¶ 79. Further, Morgan Stanley had a "significant relationship" with Blackstone, having received $100 million to $125 million in fees from Blackstone between 2016 to 2018, a far greater sum than the $10 million to $25 million that Morgan Stanley received from Gramercy during the same period. *Id.* ¶ 62.

As noted, the Proxy was filed on June 27, 2018, and supplemented on July 13, 2018. *Id.* ¶ 80. Plaintiff alleges that the Proxy contained several materially misleading statements. *Id.* ¶ 95. "The Proxy contained the recommendation of each of the Individual Defendants to Gramercy stockholders to vote in favor of the Merger." *Id.* ¶ 81. Further, the Proxy stated that the "'merger was advisable and in the best interests of the Company and our shareholders.'" *Id.* ¶ 82 (quoting ECF 26-2 at 12). And, it suggested that the Board's determination that the merger was financially fair to shareholders "was supported by a valid valuation," stating that the Board considered Morgan Stanley's Fairness Opinion a "'material factor[] . . . supporting its decision to approve the merger agreement.'" *Id.* ¶ 83 (alterations in ECF 1) (quoting ECF 26-2 at 51, 53).

In plaintiff's view, these statements misled shareholders because the Proxy "did not disclose facts demonstrating that Morgan Stanley's analyses and conclusions [in the CPC Analysis] were objectively flawed." *Id.* ¶ 90. Specifically, plaintiff complains that the Proxy omitted that the five companies that Morgan Stanley utilized in the CPC Analysis "were not comparable to Gramercy" because only two of the five companies were industrial REITs. *Id.* ¶ 91. According to plaintiff, had Morgan Stanley used industrial REITs as comparison companies, the CPC Analysis would have generated ratio ranges that implied a valuation of Gramercy's stock "in the mid-$30s to $40s." *Id.* ¶ 93. And, plaintiff maintains that the failure to disclose the comparison companies' REIT classification prevented stockholders from "discern[ing] that Morgan Stanley's valuation was objectively flawed, and the Merger consideration was unfair." *Id.* ¶ 98. Hurtado asserts: "By omitting th[is] information . . . defendants induced the Company's shareholders to accept Morgan Stanley's fairness opinion, defer to the Board's recommendation of the Merger, and give up their shares for the inadequate Merger consideration." *Id.* ¶ 100.

## I.  Standard of Review

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6). A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading

requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote

and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary

to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a

document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial

jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, the Gramercy Motion is supported by five exhibits: the Proxy (ECF 26-2); a transcript of a conference call between Gramercy officers and business analysts in regard to Gramercy's first quarter 2018 earnings, dated May 1, 2018 (ECF 26-3, "Earnings Call"); a notice advising Gramercy shareholders of a pending class action (ECF 26-4, "Lawsuit Notice"); a Form 8-K supplementing the Proxy, dated July 30, 2018 (ECF 26-5, "Supplement"); and a Form 8-K reporting the results of the merger vote, dated August 9, 2018 (ECF 26-6, "Vote Records"). Four exhibits are appended to the Morgan Stanley Motion: the Proxy (ECF 27-3); the Supplement (ECF 27-4); the Vote Records (ECF 27-5); and a Form 8-K marking the merger's completion (ECF 27-6, "Announcement").

The Proxy, Supplement, Vote Records, and Announcement are public documents that have been filed with the SEC. Clearly, the Proxy and the Supplement are integral to the suit. Moreover, plaintiff does not challenge the authenticity of these four exhibits. Accordingly, I may consider them at this stage. *See Tellabs*, 551 U.S. at 322; *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering stock analyst reports cited in complaint); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (taking judicial notice of published stock prices).

Although it is not apparent that the Earnings Call is a public record, a portion of the call is incorporated in the Complaint. *See* ECF 1, ¶ 69. Thus, I may consider the transcript without converting the motions to ones for summary judgment. In contrast, the Lawsuit Notice does not appear to be publicly accessible, nor is it referenced in the Complaint. Therefore, I shall not rely on that exhibit in resolving the motions.

## II.    Discussion

### A.  Legal Background

1.  Section 14(a) of the Exchange Act

The Exchange Act, 15 U.S.C. § 78a *et seq.*, is founded on the "belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381 (1970) (brackets in original) (quoting H.R. Rep. 73-1383, at 13 (1934)); *see J.I. Case v. Borak Co.*, 377 U.S. 426, 431 (1964) ("The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation."); *Maguire Fin., LP v. PowerSecure Int'l*, *Inc.*, 876 F.3d 541, 545 (4th Cir. 2007) ("The Exchange Act ensures that companies disclose to investors the information needed to make informed investment decisions."). To that end, § 14(a) of the Act makes it unlawful for any person "in contravention of such rules and regulations as the [SEC] may prescribe . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security."  15 U.S.C. § 78n(a)(1).

Pursuant to this authority, the SEC promulgated Rule 14a-9.  It provides, 17 C.F.R. § 240.14a-9(a):

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . .

*See Paradise Wire & Cable*, 918 F.3d at 318 (Rule 14a-9 "prohibits the solicitation of proxies through a proxy statement that contains false or misleading material facts or omits any material fact that leaves a proxy statement false or misleading").

The Supreme Court has long recognized that § 14(a) provides an implied private right of action. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1086-87 (1991); *J.I. Case*, 377 U.S. at 431. To state a claim for a violation of § 14(a) and Rule 14a-9, a plaintiff must allege that "(1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction." *Hayes v. Crown Centr. Petrol. Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3rd Cir. 1992)); *accord In re AGNC Inv. Corp.*, TDC-16-3215, 2018 WL 3239476, at *3 (D. Md. July 3, 2018); *Knurr v. Orbital ATK, Inc.*, 276 F. Supp. 3d 527, 535 (E.D. Va. 2017). "The second and third elements have been termed 'loss causation' and 'transaction causation,' respectively." *In re AGNC*, 2018 WL 3239476, at *3 (citations omitted); *see Grace v. Rosenstock*, 228 F.3d 40, 46-47 (2d Cir. 2000) (noting "both loss causation and transaction causation must be proven in the context of a private action under § 14(a) of the 1934 Act and SEC Rule 14a-9").

Regarding the first prong, an omission violates the Exchange Act only if it is material. *See Greenhouse*, 392 F.3d at 656 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). In other words, a statement or omission will not give rise to a claim under § 14(a) "'if the misrepresented fact is otherwise insignificant.'" *Greenhouse*, 392 F.3d at 656 (citing *Basic*, 485 U.S. at 238).

The Fourth Circuit has instructed that "[m]ateriality is an objective standard," *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019), viewed from "'the perspective of a reasonable investor.'" *Paradise Wire & Cable*, 918 F.3d at 318 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, ___ U.S. ___, 135 S. Ct. 1318, 1327 (2015)). "It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449

(1976).  Rather, an omission is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *In re Willis Towers Watson*, 937 F.3d at 304 (quoting *TSC Indus.*, 426 U.S. at 449); *see also Paradise Wire & Cable*, 918 F.3d at 318; *SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 240 (4th Cir. 2009).

"Determining whether the facts of a particular case meet this standard 'requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him[.]'"  *Pirate Inv'r*, 580 F.3d at 240 (quoting *TSC Indus.*, 426 U.S. at 449).  Accordingly, assessments of materiality are "'inherently fact-specific'" and therefore "are in most cases 'peculiarly ones for the trier of fact.'"  *In re Willis Towers Watson*, 937 F.3d at 304 (quoting *Basic*, 485 U.S. at 236, then quoting *TSC Indus.*, 426 U.S. at 450); *see Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004).  That said, "[n]o shortage of cases . . . make clear that materiality may be resolved by a court as a matter of law."  *Greenhouse*, 392 F.3d at 657.  Indeed, such a finding is required where "no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information."  *Id.* (citing *TSC Indus.*, 426 U.S. at 450).

With respect to the second prong, loss causation requires the plaintiff to allege "'a causal connection between the material misrepresentation and the loss.'"  *Dura Pharms. v. Broudo*, 544 U.S. 336, 342 (2005) (citation omitted); *see Katyle*, 637 F.3d at 471; *Grace*, 228 F.3d at 46; *Karp v. First Conn. Bancorp, Inc.*, RBD-18-2496, 2019 WL 4643799, at *4 (D. Md. Sept. 24, 2019).  However, the defendant's misrepresentation need only be the "proximate[] cause[] [of] the plaintiff's economic loss."  *Dura Pharms.*, 544 U.S. at 346; *see also In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 645 (D. Md. 2012) (describing loss causation

as the "proximate cause element of a securities fraud claim"). That means that "[p]laintiffs are only required to show that the defendant's conduct was a *substantial* cause of its injury; other contributing forces to the loss will not bar recovery under the loss causation requirement." *In re Mun. Mortg.*, 876 F. Supp. 2d at 645 (emphasis in original); *see Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (loss causation requires "that the damages suffered by plaintiff must be a foreseeable consequence of any mispresentation or material omission").

Regarding economic loss, the Supreme Court has recognized that shareholders suffer a cognizable economic harm where a merger "result[s] in a reduction of the earnings or earnings potential of their holdings." *Mills*, 396 U.S. at 389. In *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), for example, the plaintiffs adequately alleged loss causation by averring that "the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction." *Id.* at 97-98.

As for the third prong, to satisfy the transaction causation element, the plaintiff must connect the wrongful conduct to the securities transaction at issue. *Mills*, 396 U.S. at 385; *Grace*, 228 F.3d at 47; *Karp*, 2019 WL 4643799, at *5. This nexus is established where "the proxy solicitation . . . was an essential link in the accomplishment of the transaction" that resulted in the economic loss. *Mills*, 396 U.S. at 385. As a result, a plaintiff successfully pleads that the misleading statement caused a transaction by alleging "that the challenged proxy statement induced shareholders to directly authorize the specific transaction that resulted in the economic loss." *In re AGNC*, 2018 WL 3239476, at *3 (citing *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 796-97 (11th Cir. 2010); *Cathcart*, 980 F.2d at 933).

## 2. Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*See In re Willis Towers Watson*, 937 F.3d at 315.

In other words, § 20(a) imposes derivative liability on certain persons for primary violations of the Act. *See In re Willis Towers Watson*, 937 F.3d at 315 ("A Section 20(a) claim requires an underlying violation of the Exchange Act."); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014); *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 639 (D. Md. 2010). Thus, a plaintiff's § 20(a) claim rises or falls with the primary cause of action. *Compare Knurr*, 276 F. Supp. 3d at 544 (finding plaintiff alleged § 20(a) claim because complaint successfully stated a claim under § 14(a)), *with Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, CCB-17-132, 2018 WL 1535496, at *8 (D. Md. Mar. 28, 2018) (dismissing § 20(a) claim where plaintiff did not plead a viable § 14(a) claim), *aff'd*, 918 F. 3d 312 (4th Cir. 2019).

## 3. The Private Securities Litigation Reform Act of 1995

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, was enacted to serve the complimentary goals of "curb[ing] frivolous, lawyer-driven litigation" and "preserving investors' ability to recover on meritorious claims." *Tellabs*, 551 U.S. at 322. It does so by imposing pleading requirements in regard to suits brought under the Exchange Act, including § 14(a) and § 20(a). *See Stoneridge Inv. Partners, LLC v. Sci.–Atlanta, Inc.,* 552 U.S. 148, 165 (2008) (observing that the PSLRA applies to "'any private action' arising from the Securities Exchange Act" (quoting 15 U.S.C. § 78u-4(b)); *Hayes*, 78 F. App'x at 861 (applying the PSLRA

to a § 14(a) claim); *Carlson v. Triangle Capital Corp.*, No. 5:18-cv-332-FL, 2018 WL 3546232, at *4 (E.D.N.C. July 23, 2018) ("[T]o state a claim for a Section 14(a) violation, the complaint must satisfy the strictures of the PSLRA.").

To be sure, "'meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions.'" *Maguire*, 876 F.3d at 546 (quoting *Tellabs*, 551 U.S. at 313). But, such actions, "'if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law.'" *Maguire*, 876 F.3d at 546 (quoting *Tellabs*, 551 U.S. at 313). Thus, demanding more from plaintiffs at the pleading stage in securities cases acts "'[a]s a check against abusive litigation by private parties,' lest every rosy corporate prognostication generate potential liability." *Maguire*, 876 F.3d at 546 (brackets in *Maguire*) (quoting *Tellabs*, 551 U.S. at 313); *see Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 171-72 (4th Cir. 2007) (discussing the PSLRA's purpose).

Under the PSLRA, a plaintiff must clear three pleading hurdles. First, where a plaintiff alleges that the defendant "made an untrue statement of a material fact" or "omitted to state a material fact necessary in order to make the statements . . . not misleading," the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). And, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

Satisfying this requirement is no small task. Ordinarily, "consideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery." *Hunter*, 477 F.3d at 170. As the *Hunter*

Court explained, "under the generally applicable notice pleading rules, . . . the court [must] ask whether *any conceivable set of facts* could be proved consistent with the complaint's allegations that would permit relief to be granted." *Id.* at 173 (emphasis in original). In contrast, under the PSLRA, a court should evaluate the sufficiency of the claim by "assum[ing] that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission." *Id.* at 171 (emphasis in original). The standard is "whether the complaint states *sufficient facts* to permit a *reasonable* person to find that . . . the defendant made a false or misleading statement." *Id.* at 173 (emphasis in original). Thus, "[i]f the plaintiff fails to allege *all* facts but does allege *sufficient facts* to support a *reasonable belief* in the allegation that defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element." *Id.* at 174 (emphasis in *Hunter*) (citing *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)).

Second, in any action in which "the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," the PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A strong inference is not "merely plausible or reasonable," but must be "cogent and compelling" as compared to other explanations that may be inferred from the facts alleged. *Tellabs*, 551 U.S. at 324; *see Maguire*, 876 F.3d at 546.

Third, the PSLRA requires the plaintiff to "prov[e] that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Although this provision concerns the evidence a plaintiff must muster to prevail under the Exchange Act, the Fourth Circuit has held that "[b]ecause the PSLRA explicitly requires that the plaintiff *prove* loss causation, the general rules of pleading require that the plaintiff also *plead* it

in his complaint." *Hunter*, 477 F.3d at 185 (emphasis in original) (citing *Dura Pharms.*, 544 U.S. at 346); *see also Katyle*, 637 F.3d at 465-66.

Notably, if a complaint does not meet these pleading requirements, the PSLRA provides that a district court "shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). However, the PSLRA does not mandate dismissal with prejudice.

## B. Count I: § 14(a) Claim

Defendants assert that the omission from the Proxy that three of the five companies utilized by Morgan Stanley for its CPC Analysis were not industrial REITs does not amount to a plausible violation of § 14(a) and Rule 14a-9. In their view, plaintiff's actual dispute concerns Morgan Stanley's methodology, which, because it was fully disclosed and accurately described, cannot give rise to a § 14(a) claim. ECF 26-1 at 19-22; ECF 27-1 at 17-21; ECF 38 at 10-12. Further, defendants argue that the alleged omission is not material in light of other information contained in the Proxy, nor did it render any statement in the Proxy misleading. ECF 26-1 at 23-26; ECF 27-1 at 21-22; ECF 38 at 19-22. And, defendants contend that, even if plaintiff plausibly alleged a materially misleading omission, the Complaint nonetheless warrants dismissal because plaintiff fails to plead with the particularly required by the PSLRA that defendants acted with the requisite intent or that the omission injured shareholders. ECF 26-1 at 28-30; ECF 27-1 at 22-26; ECF 38 at 22-26.

Plaintiff counters that the alleged omission is actionable under the framework set by *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 547 U.S. ___, 135 S. Ct. 1318 (2015). ECF 37 at 21. He asserts that the omission made the Proxy misleading because it "obscure[ed] a flawed and misleading assumption underlying Morgan Stanley's analysis" that "could have led shareholders to question the reliability of the Board's recommendation on the

Merger" and which "related directly to the financial decision facing shareholders[.]" *Id.* at 26-27. Plaintiff also argues that he has satisfied the strictures of the PSLRA by alleging that defendants acted either with negligence or with scienter and that the Proxy was an essential link to Gramercy obtaining shareholder approval for the acquisition. *Id.* at 332-40.

### 1. Materiality

According to plaintiff, the failure to disclose the comparator companies' REIT classification was a material omission because it was relevant to the validity of Morgan Stanley's Fairness Opinion and the critical question of Gramercy's market value. ECF 1, ¶¶ 95-98.

As discussed, an omission is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *TSC Indus.*, 426 U.S. at 449. However, "[i]t is not enough that the omission *might have* or *could have* influenced a shareholder's decision." *Kuebler v. Vectern Corp.*, 3:18-cv-00113-RLY-MPB, 2019 WL 4243193, at *4 (S.D. Ind. Sept. 6, 2019) (emphasis in original) (citing *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016)).

The materiality of an omission "must be examined in context and in light of the 'total mix' of information made available to investors." *Phillips v. LCI Inter., Inc.*, 190 F.3d 609, 615 (4th Cir. 1999). This encompasses the entirety of the relevant SEC filing. *See, e.g.*, *J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 396 (6th Cir. 2008). And, it includes information in the public domain. *See Greenhouse*, 392 F.3d at 656 (observing that a "'reasonable investor is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing"); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) (holding that omitted information "w[as] in fact well known to the market . . . and therefore

[defendant's] omissions were not material"); *see also Tadros v. Celladon Corp.*, 738 F. App'x (9th Cir. 2018); *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 38 (2d Cir. 2017); *United Food & Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014); THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION § 10:77 (2019).

Viewing the total mix of information available to a Gramercy shareholder leaves no doubt that plaintiff's alleged omission was not material. The Proxy contained extensive financial disclosures. Beyond detailing the history of the merger negotiations, the Proxy set forth twenty-nine "material factors" that the Board considered before recommending the acquisition, eleven of which the Proxy characterized as "negative factors." ECF 26-2 at 51-54. These considerations included "the current and historical trading prices" of Gramercy stock; the Board's belief that "Blackstone was the possible acquiror likely to offer the highest price for the Company"; "the challenges of acquiring assets on an accretive basis in light of the increasingly competitive environment for industrial real estate assets"; and "the fact that, following the merger, the Company will no longer exist as an independent public company[.]" *Id.* Thus, the Proxy made clear that the Fairness Opinion was but one of many variables the Board evaluated in arriving at its decision.

The Proxy also contained an exhaustive summary of Morgan Stanley's Fairness Opinion. *Id.* at 61-69. It identified the results of the seven financial analyses that Morgan Stanley performed. *Id.* at 63-67. Notably, the per share valuation range produced by the CPC Analysis fit comfortably within the estimates produced by the other five valuations and Gramercy's historical stock price data. *Id.* The CPC Analysis estimated that the value of a Gramercy share was between $21.92 and $25.08. ECF 26-2 at 64. In comparison, the "Research Analyst Price Targets and NAV

Targets" analysis generated a range of $25.00 to $30.00; the "Net Asset Value Analysis" produced a range of $24.49 to $28.93; the range for the "Discounted Cash Flow Analysis" was $24.08 to $27.86; the "Premiums Paid Analysis" estimated a range of $26.09 to $28.04; and the "Private Buyer Analysis" calculated a range of $23.35 to $27.25. *Id.* at 63-67. Regarding Gramercy's historical stock price performance, between April 27, 2017, and April 27, 2018, Gramercy's stock vacillated in price from $21.12 to $31.26. *Id.* at 67.

Further, the Proxy detailed the methodology and assumptions underlying each analysis. Focusing on the CPC Analysis, the Proxy disclosed the five companies that Morgan Stanley selected as comparators. *Id.* at 63. And, it explained that Morgan Stanley chose these companies because they "share[d] similar business characteristics" with Gramercy. *Id.* The Proxy also outlined the five financial metrics that Morgan Stanley employed, the ranges it derived for each ratio, and each ratio's implied per share equity value. *Id.* at 64.

Given these comprehensive disclosures, the Proxy provided shareholders more than enough information to decide how to vote. To be sure, a reasonable shareholder *could* have found the fact that some of the comparator companies were non-industrial REITs helpful to his deliberations. Perhaps, he *might* have. But that is insufficient. There must be a "*substantial likelihood*" that the omission "*would* have . . . significantly altered the total mix of information made available." *TSC Indus.*, 426 U.S. at 449 (emphasis added).

Here, no reasonable juror could reach that conclusion because the Proxy provided a thorough and accurate summary of Morgan Stanley's work. *See Kuebler*, 2019 WL 4243193, at *6 (collecting cases for the proposition that the failure to disclose inputs in a proxy's financial valuation "are immaterial when a proxy statement contains other valuation projections and a summary of the financial advisor's analysis"); *Vardakas v. Am. DG Energy Inc.*, No. 17-cv-10247-

LTS, 2018 WL 1141360, at *5 (D. Mass. Mar. 2, 2018) (ruling omission of criteria that defendant's financial advisor used to select comparator companies for fairness opinion analysis was immaterial because the companies themselves were disclosed); *Ridler v. Hutchison Tech., Inc.*, 216 F. Supp. 3d 982, 988-89 (D. Minn. 2016) (holding omitted information that plaintiff alleged concealed "flaws in the fairness opinion" was not material "given the detail provided in the nearly 200-page proxy and fifteen independent reasons given by the board in recommending the merger").

Furthermore, the omission was rendered immaterial by the Proxy's warnings. "[W]arning language in [a] Proxy implicates what is known as the 'bespeaks caution' doctrine." *Paradise Wire & Cable*, 918 F. 3d at 319. According to that doctrine, "claims are 'subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions.'" *Id.* (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996)); *see also Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 714 (E.D. Va. 2014); *In re Constellation Energy Grp.*, 738 F. Supp. 2d at 625. This occurs where the proxy contains "specific warnings that are tailored to address the alleged misrepresentation or omission" such that "the total mix of information would not be significantly altered by the disclosures sought by the plaintiffs." *Paradise Wire & Cable*, 918 F. 3d at 319.

The case of *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F. 3d 312 (4th Cir. 2019), provides helpful guidance. There, former shareholders of a REIT filed suit against the REIT's former directors after it was acquired in a buy-out. They alleged that the proxy was misleading, in violation of § 14(a) and Rule 14a-9, because it omitted information concerning the REIT's financial condition. *Id.* at 315-17. In part, plaintiffs asserted that the NAV reported in the proxy was materially misleading because it was outdated. *Id.* at 319. The district court dismissed the complaint. *Id.* at 317. The Fourth Circuit affirmed. *Id.* at 324.

With respect to the plaintiff's allegations concerning the proxy's statements about the company's NAV, the Fourth Circuit determined that the "extensive, specific, and tailored" warnings in the proxy "address[ed] the very complaints the [plaintiffs] make about the NAV." *Id.* at 319. Specifically, the proxy cautioned that the NAV estimate was effective as of a particular date; it warned that the valuation did not reflect events after that date nor would it be revised; it stated that market changes could affect the company's NAV; and, it noted that the company's value might change upon the finalization of the merger. *Id.* Thus, the Court concluded that, "even accepting the allegations about the NAV as true, the warnings here negated the materiality of the alleged statements and omissions[.]" *Id.* at 319-20. "To find otherwise," the Court reasoned, "would be to ignore the express warning language of the Proxy." *Id.* at 320.

Similarly, the Proxy here contains disclaimers that address plaintiff's alleged omission. The Proxy expressly disavowed any representation that the comparator companies used in the CPC Analysis were a perfect match to Gramercy, cautioning, ECF 26-2 at 64:

> No company utilized in the comparable company analysis is identical to the Company. In evaluating companies, Morgan Stanley made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, which are beyond the Company's control, such as the impact of competition on the Company and the industry generally, industry growth, and the absence of any adverse material change in the financial condition and prospects of the Company or the industry, or in the financial markets in general.

And, at the conclusion of the summary of the Fairness Opinion, the Proxy dispelled the notion that the methods used, or results reached, in the Fairness Opinion reflected Gramercy's true value. The Proxy warned, *id.* at 68:

> In performing its analyses, Morgan Stanley made numerous assumptions with respect to industry performance, general business, regulatory, economic, market and financial conditions and other matters. These include, among other things, the impact of competition on the business of the Company, and the industry generally, industry growth, and the absence of any adverse material change in t eh

financial condition and prospects of the Company, or the industry, or the financial markets in general. . . . Any estimates contained in Morgan Stanley's analyses are not necessarily indicative of future results or actual values, which may be significantly more or less favorable than those suggested by such estimates.

These are not boilerplate statements. On the contrary, these warnings neutralize plaintiff's contention that the basket of companies utilized in the CPC Analysis are not sufficiently similar to Gramercy. Further, they make clear that the CPC Analysis rests on a mountain of assumptions that could have been incorrect. As such, these warnings negate the materiality of the alleged omission.

Moreover, the information that plaintiff claims was omitted was public information, equally available to defendants and shareholders alike. "'Although the underlying philosophy of federal securities regulation is that of full disclosure, there is no duty to disclose information to one who reasonably should be aware of it.'" *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (quoting *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)). That is because the "[d]isclosure of information already publicly available does not materially alter the 'total mix' of available information." *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 721 (E.D. Va. 2003) (citing *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262–63 (4th Cir. 1993)). Thus, "[i]t has long been established that 'where information is equally available to both parties, a defendant should not be held liable to the plaintiff under the securities laws for failure to disclose.'" *Bettis v. Aixtron SE*, 16 Civ. 00025 (CM), 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016) (quoting *Seibert*, 586 F.2d at 952).

In an analogous context, the court in *Vardakas v. American DG Energy Inc.*, No. 17-cv-10247-LTS, 2018 WL 1141360 (D. Mass. Mar. 2, 2018), found no duty to disclose the alleged omission under the Exchange Act. In that case, the plaintiffs brought a securities class action following the acquisition of American DG, alleging that the defendants disseminated a misleading proxy, in violation of § 14(a). *Id.* at *1. In particular, the plaintiffs asserted that the proxy contained

material omissions, including the criteria that the defendant's financial advisor used to select the comparator companies used in a CPC Analysis and the rationale for not using any of American DG's identified competitors. *Id*. at *5. According to the plaintiffs, shareholders needed this information "to 'recognize the illegitimacy' of the [financial advisor's] analysis.'" *Id*. at *4 (quoting the complaint).

The court determined that neither omission was material. *Id.* "The omission of the selection criteria is not material," the court observed, "because an interested shareholder had the option of researching the comparators and determining for herself whether the comparators were good ones." *Id.* Thus, the omission "does not mask whether the comparators are in fact good comparators." *Id.* Likewise, the failure to disclose why defendant's competitors were not selected as comparators was not material; "[s]hareholders reading the proxy's list of companies in the Selected Companies Analysis would know, or could determine, that no competitor was included in the last and draw their own conclusions from that fact." *Id.*

Here, the information that plaintiff complains was omitted from the Proxy was not uniquely in the possession of defendants. The Proxy disclosed that Morgan Stanley compared Gramercy to Lexington Realty Trust, Monmouth Real Estate Investment Corporation, STAG Industrial, Inc., W.P. Carey Inc., and VEREIT, Inc. ECF 26-2 at 63. It also stated that the comparators were "publicly-traded companies." *Id.* Given that the way in which market indices classify these companies is information easily accessible in the public domain, "an interested shareholder had the option of researching the comparators and determining for herself whether the comparators were good ones." *Vardakas*, 2018 WL 1141360, at *5. Because the companies' REIT classifications were in the public domain, the omission of this information did not affect the information available to Gramercy's shareholders.

In sum, considering the full mix of statements in the Proxy as well as the Proxy's tailored warnings, combined with publicly available information, the omission was not material. Therefore, plaintiff has not stated a plausible § 14(a) claim.

## 2. Misleading statements

Even assuming, for the sake of argument, that the omitted information was material, it did not render any statements contained in the Proxy false or misleading.

In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. ___, 135 S. Ct. 1318 (2015), the Supreme Court addressed when an opinion statement may be misleading for the purposes of federal securities law. Omnicare, a pharmacy services company, filed a registration statement with the SEC in anticipation of a public offering that contained statements expressing Omnicare's view that its relations with healthcare provides and pharmaceutical manufacturers complied with federal and state law. *Id.* at 1323. After the public offering, the federal government pressed lawsuits against Omnicare for violating anti-kickback laws. Citing those lawsuits, plaintiffs, pensions that purchased Omnicare stock, sued Omnicare, alleging that Omnicare omitted facts that made its opinion on legal compliance misleading, in violation of § 11 of the Securities Act of 1933. *Id.* at 1324.[4]

The Court considered, *inter alia*, when an omission of fact makes a statement of opinion misleading. *Id.* at 1327. Like the materiality inquiry, "whether a statement is 'misleading' depends

---

[4] Although *Omnicare* involved a claim under Section 11 of the Securities Exchange Act of 1933, the Supreme Court noted that its analysis was not unique to Section 11. *Omnicare*, 135 S. Ct. at 1330. Indeed, it recognized that § 14(a) "bars conduct similar to that described in § 11." *Id.* at 1326 n2. Thus, courts have applied *Omnicare* to § 14(a) claims. *See Baum v. Harman Int'l Indus., Inc*., 3:17-cv-00246 (RNC), 2019 WL 4889194, at *5 (D. Conn. Oct. 3, 2019); *Trahan v. Interactive Intel. Grp., Inc*., 308 F. Supp. 3d 977, 987 (S.D. Ind. 2018); *Knurr v. Orbital ATK, Inc.*, 276 F. Supp. 3d 527, 538 (E.D. Va. 2017).

on the perspective of a reasonable investor[.]" *Id.* (citing *TSC Indus.*, 426 U.S. at 445). "[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect," the Court explained, because "[r]easonable investors do not understand such statements as guarantees[.]" *Id.* at 1328. However, "a reasonable investor may, depending on the circumstances," perceive an opinion to convey facts "about the speaker's basis for holding that view." *Id.* "And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.*

However, the Court cautioned that an opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts," and they "do[] not expect that *every* fact known to an issuer supports its opinion statement." *Id.* at 1329 (emphasis in original).

The Court also instructed that "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 1330. It stated, *id.*:

> Investors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life. At the same time, an investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information. And the investor takes into account the customs and practices of the relevant industry. So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.

Further, the Court made clear that stating a plausible claim that a factual omission resulted in a misleading opinion statement is "no small task[.]" *Id.* at 1332. To do so, the plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission

makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 1332.

Under *Omnicare*, the failure to disclose the REIT classification of the comparator companies does not render misleading the opinions of the Board and Morgan Stanley that the acquisition was fair. In the abstract, a reasonable shareholder might understand the opinion that the $27.50 price was fair to convey that such an opinion was based on a CPC Analysis that compared Gramercy only against other industrial REITs. But, "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 1330. And here, the context makes such a belief untenable, for the reasons set forth above.

The Proxy explained that the comparator companies were selected due to their "similar business characteristics" with Gramercy, not based on how market indices classified them. And, the Proxy advised shareholders that these companies were not identical to Gramercy. The Proxy also fully disclosed the steps that Morgan Stanley took in performing the CPC Analysis and readily acknowledged that this process was suffused with subjective judgments and may undervalue or overvalue Gramercy's stock price.

Accordingly, plaintiff fails adequately to allege that the omission rendered misleading the Proxy's opinion that the $27.50 share price was fair. It follows that plaintiff has not adequately pleaded a claim under § 14(a).

### C. Count II: § 20(a) Claim

Plaintiff also seeks to impose control person liability against members of the Board, under § 20(a). ECF 1, ¶¶ 122-28. Because liability under § 20(a) is predicated on a primary violation of the Act, a § 20(a) claim may be summarily dismissed when the plaintiff fails to state a claim for liability under § 14(a). *See Yates*, 744 F.3d at 901 n.14; *Greenhouse*, 392 F.3d at 656 n.7.

I have concluded that plaintiff has not pleaded a violation under § 14(a). Therefore, his § 20(a) claim also fails.

### III.    Conclusion

For the foregoing reasons, I shall grant the Gramercy Motion (ECF 26) and the Morgan Stanley Motion. ECF 27.

Ordinarily, a court should allow a party an opportunity to amend his complaint. Fed. R. Civ. P. 15(a); *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013). However, "[a] district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 769 (4th Cir. 2011) (quoting *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010)). Here, amendment would be futile because plaintiff's omission is rendered immaterial by information contained in the Proxy, the Proxy's tailored warnings, and facts in the public domain. Therefore, I shall dismiss the Complaint with prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: December 4, 2019                                    _____/s/_____
                                                          Ellen L. Hollander
                                                          United States District Judge